**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **HADIYA ABDULSALAAM, et al.,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **Case No. 06-CV-413** |
| | : | |
| **FRANKLIN COUNTY BOARD OF** | : | **JUDGE ALGENON L. MARBLEY** |
| **COMMISSIONERS, et al.,** | : | |
| | : | **Magistrate Judge Abel** |
| **Defendants.** | : | |
| | : | |

## <u>OPINION & ORDER</u>

## I.  INTRODUCTION

This matter comes before the Court on the parties cross-motions for summary judgment. Plaintiffs, a mother and her three daughters, were separated for a year, during which time the children were placed in the custody of the Franklin County Children Services ("FCCS") due to allegations of educational neglect and physical abuse.  Plaintiffs allege that the allegations of abuse and neglect were fabricated by the FCCS caseworker and were the result of racial discrimination by the caseworker and the agency.  Defendants move for summary judgment on all counts.  Plaintiffs move for partial summary judgment on the issue of whether Defendants can argue that the separation was reasonable.  For the reasons explained below, the Court **GRANTS in PART** and **DENIES in PART** Defendant's motion and **DENIES** Plaintiff's motion.

## II. BACKGROUND

### A. Facts

Plaintiff Hadiya Abdulsalaam ("Hadiya") is an African-American mother of five. She has four daughters, Mandisa and Plaintiffs Makeba Kristos ("Makeba"), Meserete Kristos ("Meserete"), and Masika Kristos ("Masika"), and one son, Mandela Kristos ("Mandela").[1] Hadiya and her children converted to Islam in 1996 when Hadiya married Naim Abdulsalaam ("Naim"), the children's step-father. At the time of the facts giving rise to this case, the family operated a small business selling items at street fairs and similar events.

### *1. Involvement with FCCS Begins*

The family became involved with FCCS in December of 2002, when Hadiya contacted the agency due to problems handling Mandela's behavior. (Spires Dep. 67-68.) By April 2003, Mandela was living in a Columbus, Ohio youth shelter. (Spires Dep. 67-68.) Later that month, he was placed in the temporary custody of FCCS and assigned to a foster home with Hadiya's consent because Hadiya refused to take him back into the house. (Spires Dep. 68.) Makeba, Meserete, and Masika were placed on a "voluntary protective services plan." A voluntary protective services plan is used when the family agrees to work with FCCS so that the agency can help provide services to the family. (Spires Dep. 75.) At that time, the case was assigned to Defendant Courtney Allensworth ("Allensworth"),[2] who was the case supervisor, and Defendant Amber Spires ("Spires"), who was the caseworker. Allensworth and Spires were both relatively new to their positions at FCCS.

---

[1] Mandela and Mandisa are not plaintiffs in this case.

[2] Allensworth's name is currently Courtney Flowers due to her marriage. (Allensworth Dep. 7.) She will be referred to as Allensworth throughout this Opinion as that was her name at the time of the relevant events and in the relevant documents.

According to Spires and her interview reports, Mandela and the girls reported physical abuse in the home. On April 17, 2003, FCCS intake notes report that Mandela claimed that on two occasions, Naim tied him to the rafters in his basement, stripped him naked, and beat him while his mother watched. (Pls.' S.J. Ex. 13, APX00178.) On May 8, 2003, Spires interviewed Makeba and Meserete outside of Hadiya's presence. Although Spires testified that only Makeba and Meserete were present for the interview, the written record of the interview indicates that all three girls were present. (Pls.' S.J. Ex. 13, APX00184.) According to Spires' interview notes, the girls confirmed Mandela's report of his beating and indicated that they were disciplined with a wooden dowel or paddle. (Spires Dep. 89-90.) According to the Spires, they also asked if they could remove their headscarves. (*Id*. at 94.) The interview notes further indicate that Meserete "reported that she did not like being Muslim and that she really does not like having to cover her head at all times." (Pls.' S.J. Ex. 13, APX 00184.)

According to Spires' May 8 and May 23 interview notes, Mandela continued to report additional instances of physical abuse, including that "he was beat by his step-father on several occasions until he lost control of his bowels" and that his sisters were similarly beaten. (Pls.' S.J. Ex. 13, APX 00187-188.)

Meserete, Makeba, and Masika contradict much of that evidence. They testified that Masika was not present at the May 8, 2003 interview. (Makeba Dep. 16, Masika Dep. 18-19.) Meserete and Makeba testified that they did not ask to remove their headscarves at that interview and that they both told Spires that they liked practicing Islam. (Makeba Dep. 15; Meserete Dep. 28, 79, 82.) Meserete denies that Mandela was ever hung in the basement and beaten or that she ever told Spires that he was. (Meserete Dep. 18, 21.) Makeba and Masika testified that they did

not remember such an incident occurring. They testified that when they were younger, approximately until age 8, they were spanked but that discipline was not physical after that age. Masika denied that corporal punishment was ever used in the house. (Masika Dep. 19.) Meserete also testified that she never said anything to Spires about physical abuse and that she did not tell Spires that she did not like being Muslim. (Meserete Dep. 23, 79-80.) Masika testified that there was no physical abuse in the household.

All three girls testified that they were not pressured to renounce their religion by Spires or anybody else at FCCS. Makeba and Meserete testified, however, that Spires brought up the issue of their religion. Makeba testified that Spires used a negative tone when she asked them about their religion.

On July 2, 2003, FCCS filed a complaint with the Franklin County Juvenile Court alleging educational neglect and dependency. It did not allege physical abuse of the children. According to the Complaint, the girls were "responsible for running the family business without adult supervision" and "work for long periods of time." The complaint goes on to allege that the children were responsible for all household chores, were not immunized, and did not receive updated medical care. It alleges that "Mother has indicated to [FCCS] that the children are being home schooled . . . [h]owever, [FCCS] has learned that the children were removed from the home school program through Columbus Public Schools." The April 23, 2003 interview notes, however, indicate that Masika was currently enrolled in public school and the May 8, 2003 notes report that Meserete told Spires she would be attending public school the next year and that Makeba would attend the year after that. (Pls.' S.J. Ex., APX00182, 00185.) Finally, and despite Spires interview notes recording a May 8 and June 6, 2003 unsupervised visit with the girls, the

complaint states that Hadiya "has not allowed for the caseworker to visit with the children separately."

## 2. FCCS Takes Temporary Custody of Masika, Meserete, & Makeba

A week after the complaint was filed, the court granted temporary custody of Masika, Meserete, and Makeba to FCCS. On July 7, 2003 the girls were removed from Hadiya's home. Masika was placed in an emancipation program due to her age. Meserete and Makeba were placed in a Christian foster home. Hadiya objected to the placement and requested that the girls be placed in a Muslim foster home.

Following the girls' removal, Hadiya continued to attempt to have them placed with a Muslim Foster family. Lisa Upshaw-Haider, a Muslim woman who was in the process of completing foster parent training, contacted FCCS to offer her home as a placement for the children. Spires interview notes indicate that Upshaw-Haider was a friend of Hadiya's, but Hadiya denies this. Upshaw-Haider was licensed as a foster parent by Ohio on August 1, 2003. On August 11, 2003, Upshaw-Haider called Spires to inform Spires that she had been licensed. According to a letter written by Upshaw-Haider regarding the call, Spires told Upshaw-Haider that FCCS "did not want [the girls] in a Muslim foster home." (Pls.' S.J. Opp'n Ex. 33, APX00299.) The girls were never placed in Upshaw-Haider's care.[3]

Between July and August 2003, Hadiya complained that FCCS' actions were discriminatory. She complained to Selma Harrison, the FCCS Affirmative Action Officer and FCCS Ombudsman, Ken Cohen. Her complaints included that Makeba and Meserete were being

---

[3] According to Defendants the girls were not placed with Upshaw-Haider because FCCS believed that she was a friend of Hadiya and Naim. They claim that no other Muslim foster home was available.

taken to a Christian church by their foster family, that Makeba and Meserete were not being

permitted to contact friends and church members,[4] and that the FCCS refused to put Makeba and

Meserete in Upshaw-Haider's custody.

### 3. August 1, 2003 Supervised Visits & Alleged Death Threats

On August 1, 2003, Naim, Hadiya, and her daughters met for a supervised visit.  During

the visit Naim read from the Koran.  The visit was terminated abruptly.  Spires claims that she

ended the interview early because Naim began interpreting the Koran to comment on the case and

that he claimed FCCS was trying to eradicate the Muslim religion.  She also claims that at the as

she tried to leave the room Hadiya grabbed her and she was forced to call security.  Plaintiffs

deny that Naim interpreted the Koran to comment on FCCS or the case.  Makeba testified that

Hadiya never put her hands on Spires.  She also testified that the family was not permitted to pray

together during visitations.  (Makeba Dep. 45.)

In February 2003, Spires went on maternity leave.  Shortly before she left, she claims to

have received a call from Mandela at her home in which he reported that he had been recruited by

his mother to kill Spires.  Spires told Allensworth and John Saros ("Saros"), the Executive

Director of FCCS, about the threat.  When Saros learned of the threat on February 19, 2003, he

removed Spires from the case and a new caseworker took over.  In April 2003, Allensworth was

taken off the case.  In September of 2003, Hadiya filed a second complaint with the FCCS'

Ombudsman Office and contacted the Columbus Dispatch about the case.  During the fall, Hadiya

continued to complain about her treatment to various agencies.

---

[4] Specifically, Hadiya gave Spires a list of telephone contact numbers of individuals associated
with the mosques that the family attended.  According to Hadiya, Spires refused to give the list
to the girls and prevented the girls from calling those people.  According to Spires and FCCS the
girls had no interest in calling those people.

*4. End of Juvenile Suit & Reversal of Magistrate's Neglect Finding*

The juvenile court case lasted nearly two years. During that time, the complaint against Hadiya and Naim was dismissed by operation of law four times[5] and re-filed by the State five times. (Pls.' S.J. Ex. 33, APX00326.) Ultimately, the case was tried to a magistrate as an educational neglect case. The magistrate found the educational neglect had occurred but ordered on July 19, 2004, that the Makeba and Meserete[6] be returned to Hadiya's custody temporarily. Hadiya filed an objection to the magistrate's Orders.

On September 1, 2005, a Domestic and Juvenile Court Judge reversed the magistrate's finding of educational neglect and terminated the case. According to the Judge, "the evidence is plentiful that these children were superbly educated in their home schooling environment." (*Id.*, APX00333.) The court further concluded that "reasonable efforts, based on the Court's review of the testimony and evidence presented in this matter, were not made to prevent the removal, or continued removal, of the children from their home." (*Id.*, APX00336.) Finally, the juvenile court noted that, although some of the re-filed complaints contained allegations regarding corporal punishment, none of the complaints contained a cause of action for physical abuse and the allegations had not been substantiated by the evidence. (*Id.*, APX000337-38.)

**B. Procedural History**

On May 31, 2006, Hadiya, on behalf of herself and her minor child Makeba, as well as Meserete and Masika filed a complaint against the Franklin County Board of Commissioners ("Board of Commissioners"); the Board of Trustees of FCCS ("FCCS Board"); John Saros

---

[5] Under Ohio law, this type of juvenile case must be concluded within 90 days of filing or they are automatically dismissed and must be refilled. Ohio Rev. Code Ann. § 2151.28.
[6] By this time Masika was 18 and thus no longer a minor.

("Saros"), the executive director of the FCCS; Courtney Allensworth; and Amber Spires alleging violations of state and federal law stemming from FCCS' investigation and separation of Hadiya and her three daughters. On July 26, 2006, Plaintiffs voluntarily dismissed Defendant Board of Commissioners from the suit with prejudice. In February 2008, the parties filed cross-motions for summary judgment. Those motions were mooted by the filing of an Amended Complaint with leave of the Court on October 3, 2008.

The Amended Complaint contains four claims against the FCCS Board, Saros, Allensworth, and Spires. Saros, Allensworth, and Spires are sued in their individual and official capacities. The first three counts of the complaint allege various 42 U.S.C. § 1983 violations. Count One alleges a 42 U.S.C. § 1981 equal benefits clause claim through §1983. (Pls.' Opp'n Br. 1.) In that Count, Plaintiffs claim that Defendants denied them equal benefit of the law by administering FCCS services to the family in a racially discriminatory manner and subjecting Hadiya to "discriminatory punishments and pains because of her race." (Amend. Compl. ¶ 25.) Count Two alleges that Defendants violated Plaintiffs' substantive due process rights under color of state law because their actions in separating the family, influencing the children to repudiate their religion, and refusing to close the case when they knew there was no basis to continue the separation deprived Plaintiffs of their First Amendment right to familial association, and deprived Hadiya of her Fourteenth Amendment right to direct the education and upbringing of her daughters. Count Three alleges that Defendants committed retaliation in violation of 42 U.S.C. § 1983 because Defendants actions were motivated by a desire to intimidate and silence Hadiya from complaining of FCCS' racial and religious discrimination in violation of her First Amendment speech rights. Count Four alleges that Defendants' acts constituted

intentional/reckless infliction of serious emotional distress under Ohio law.  Although the original

complaint contained a fifth count alleging malicious prosecutions, Plaintiffs appear to have

abandoned that claim as it does not appear in their Amended Complaint.

Defendants have moved for summary judgment as to all of Plaintiffs claims.  Plaintiffs

seek partial summary judgment against Defendants.  Those motions are now before the Court.

### III.  STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [such

that] the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  But "summary

judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for

the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   In

considering a motion for summary judgment, the court must construe the evidence in the light

most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

U.S. 574, 587 (1986).  The movant therefore has the burden of establishing that there is no

genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v.

Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993).

But the non-moving party "may not rely merely on allegations or denials in its own

pleading."  Fed. R. Civ. P.56(e); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d

282, 286 (6th Cir. 1994).  Instead the non-movant must "set out specific facts showing a genuine

issue for trial."  Fed R. Civ. P. 56(e); *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir.

1993) (The non-moving party must present "significant probative evidence" to show that there is

more than "some metaphysical doubt as to the material facts.").   "[C]onclusory and unsupported

allegations, rooted in speculation, do not meet [the] burden" of demonstrating that there is a

genuine issue for trial. *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir.2003) (internal

quotation marks omitted) (quoting *Bryant v. Commonwealth of Kentucky*, 490 F.2d 1273, 1274

(6th Cir.1974)). Furthermore, it is not the district court's duty to sift through the record to search

for evidence supporting a party's opposition to summary judgment. *Williamson v. Aetna Life Ins.

Co.*, 481 F.3d 369, 379 (6th Cir. 2007) (citing *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 916

n.7 (5th Cir. 1992).

The standard of review for cross-motions of summary judgment does not differ from the

standard applied when a motion is filed by only one party to the litigation. *Taft Broad. Co. v.

United States*, 929 F.2d 240, 248 (6th Cir. 1991).

> The fact that both parties have moved for summary judgment does not mean that
> the court must grant judgment as a matter of law for one side or the other;
> summary judgment in favor of either party is not proper if disputes remain as to
> material facts . . . Rather, the court must evaluate each party's motion on its own
> merits . . . .

*Id.* (citations omitted).

## IV. LAW & ANALYSIS

### A. Defendants' Motion for Summary Judgment

Defendants claim they are entitled to summary judgment on all of Plaintiffs' claims. With

respect to the three § 1983 claims they argue that: (1) there is no evidence that Plaintiffs were

treated differently based on their race; (2) the FCCS Board cannot be held liable based on *Monell

v. New York Dep't of Soc. Serv.*, 436 U.S.658, 694 (1978); (3) Allensworth and Saros cannot be

held liable under a *respondeat superior* theory; (4) they are entitled to absolute immunity; and (5)

they are entitled to qualified immunity. With respect to Plaintiffs' intentional infliction of

emotional distress claim, Defendants argue that they are entitled to summary judgment because

they are immune from liability under Ohio law.[7]

*1. § 1983 Claims*

Section 1983 of 42 U.S.C. provides:

> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

To succeed on a claim for a violation of § 1983, the plaintiff must show that: (1) a person; (2) acting under color of state law; (3) deprived him of his rights secured by the United States Constitution or its laws. *Waters v. City of Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001). By its terms, § 1983 creates no substantive rights; it merely provides a remedy for deprivations of rights established elsewhere. *Oklahoma City v. Tuttle*, 471 U.S. 808, 815 (1985).

Plaintiffs federal claims are as follows. First, Plaintiffs claim that because of their race, Defendants fabricated evidence of child abuse and neglect against them, failed to make attempts to keep the family intact as required by Ohio law, resulting in the one year separation of the family pursuant to a court-issued temporary custody order (Count One). Second, Plaintiffs allege that the Defendants intentionally impeded the ability of the girls to practice Islam while they were in FCCS custody (Count Two). They also claim in Count Two that the Defendants violated the Plaintiffs' First and Fourteenth Amendment rights to familial association by fabricating evidence of abuse and neglect and refusing to drop the case despite lack of substantiation of the abuse and neglect claims. Finally, they claim that the Defendants retaliated against Hadiya for complaining

---

[7] Defendants also move for summary judgment on the malicious prosecution claim that appeared in the original complaint. As the Plaintiffs appear to have abandoned this claim and failed to include a malicious prosecution count in their Amended Complaint, this Court will not address arguments related to that defunct claim.

to the media and others about their discriminatory conduct in violation of her First Amendment free speech rights (Count Three). They appear to claim that Spires retaliated by "papering the [FCCS] file with allegations" that Hadiya assaulted Spires during the August 1, 2003 supervised visit and that Hadiya threatened to kill Spires, that Saros retaliated by making statements in two newspaper articles that falsely implied that the girls did not want to practice Islam, and that Allensworth retaliated by "torpedoing" Hadiya's attempts to secure a larger apartment from the Homeless Family Foundation. (Pls.' Opp'n Br. 19, 20, 26, 30.)

### a. Plaintiffs' § 1981 Claim Filed Through § 1983

Section 1981 provides that all persons have the right to "the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). "To prevail on a section 1981 claim, a litigant must prove intentional discrimination on the basis of race, which involves a high threshold of proof." *Chapman v. Higbee Co.*, 319 F.3d 825, 832-33 (6th Cir. 2003). Other types of discrimination, such as discrimination on the basis of religious affiliation, are not actionable under the statute. *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987); *Runyon v. McCrary*, 427 U.S. 160, 167 (1976). To establish a claim for racial discrimination under § 1981, a plaintiff must show that: "(1) [she] belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against [her] on the basis of race; and (3) the defendant's discriminatory conduct abridged a right enumerated in section 1981(a)." *Amini v. Oberlin College*, 440 F.3d 350, 358 (6th Cir. 2006).

There is no dispute that Plaintiffs are members of an identifiable racial minority. Defendants argue that Plaintiffs have failed to provide any evidence demonstrating that they were

intentionally discriminated against on the basis of race.  The Court agrees.  The Court's review of the record shows no direct or circumstantial evidence that the Defendants took any actions against Hadiya or her family on the basis of their race.  Furthermore, Defendants have provided a non-discriminatory rational for their separation of the family, i.e., that they had received complaints of child abuse from Hadiya's son that they believed were substantiated by the girls, that they took custody of the girls pursuant to a Court Order, and that they had not received any evidence that Hadiya had filed the proper paperwork with the Columbus Public Schools indicating that she was home schooling the girls.  *See* Ohio Rev. Code § 5153.16(A).

Tellingly, in response to the Defendants challenge, Plaintiffs do not point to any record evidence supporting their claim of *racial* discrimination.[8]  Instead, they argue that the Defendants were charged under Ohio law with providing for the safety and security of minors and with keeping "the family together unless completely impractical to do so," and note that the juvenile court ultimately found that they failed to satisfy those statutory mandates.  (Pls.' S.J. Opp'n. Br. 35.)  The juvenile court's Order does state that "reasonable efforts, based on the Court's review of the testimony and evidence presented in this matter, were not made to prevent the removal, or the continued removal of the children from their home."  (Pls.' S.J. Ex. 33, 13.)  The juvenile court, however, did not find or even suggest that the Defendants' actions were the result of racial discrimination.  The Defendants could have failed to meet their statutory obligations for any number of non-racially motivated reasons including incompetence, slothfulness, or good-faith error.  Thus, the Plaintiffs cannot rely on the juvenile court Order as evidence of racial discrimination.

---

[8] For example, the do not provide any evidence that any non-African-American families were treated differently by the Defendants or even allege that this occurred.

In lieu of presenting the Court with evidence substantiating their § 1981 racial discrimination claim, Plaintiffs simply state that "[i]n this case, Plaintiffs were treated equally neither as to their race, nor their religion."  (Pls.' S.J. Opp'n. Br. 35.)  This conclusory assertion, unaccompanied as it is by any factual support, would be insufficient to withstand a motion to dismiss, and is even more inadequate at the summary judgment phase.  *See Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir. 1986) (holding that "mere conclusory allegations of unconstitutional conduct by persons acting under state law" are insufficient to forestall dismissal of §1983 actions).  Finally, Plaintiffs attempt to side-step the requirement that they produce evidence of racial discrimination altogether.  They argue without further explanation that "it is impossible, on these facts, to separate religious from racial discrimination."  (Pls.' Opp'n Br. 35.)

To the extent that Plaintiffs are asking this Court to scan the record for evidence that they were discriminated against because they practiced Islam, and use that evidence to salvage their § 1981 claim, Plaintiffs are misguided.  As a threshold consideration, it is well-established that a § 1981 claim cannot be brought on the basis of religious discrimination.  *See, e.g., Al-Khazraji*, 481 U.S. at 613.  Therefore, even if the record showed that Defendants discriminated on the basis of religion, summary judgment on the § 1981 claim would be proper.  Second, the Court has no duty when deciding a motion for summary judgment to scour the record for evidence that supports a plaintiff's claims.  *Williamson*, 481 F.3d at 379.  Third, the Plaintiffs have not cited, nor is the Court independently aware of, any precedent permitting the type of boot-strapping Plaintiffs suggest and, therefore, their undeveloped argument is waived.  *United States v. Robinson*, 390 F.3d 853, 886 (6th Cir. 2004) (arguments presented in "wholly cursory fashion, without any citation to supporting authority" are waived); *Gen Star Nat'l Ins. Co. v. Administratia*

*Asigurarilor de Stat*, 289, F.3d 434, 441 (6th Cir. 2002) (same); *United States v. Lanzotti*, 205

F.3d 951, 957 (7th Cir. 2000) (explaining that "[i]t is not this court's responsibility to research

and construct the parties arguments.").  Fourth, and finally, the Court is not persuaded that race is

indistinguishable from religion in this case.  There is a distinction between being discriminated

against on the basis of practicing a religion and being discriminated on the basis of being part of a

racial group associated with a religion; the former is insufficient to support a § 1981 claim, while

the latter may be actionable.  *See, e.g., Furman v. DaimlerChrysler Corp.*, No. 2:06-cv-784, 2007

WL 4562317, at *4-5 (S.D. Ohio Dec. 20, 2007) (recognizing distinction between being

discriminated against for practicing Judaism and for being Jewish).  Nor does the Court believe

that Muslims can be viewed as a racially monolithic bloc.[9]  As Plaintiffs have failed to put

forward evidence supporting an essential element of their § 1981 claim, Defendants' Motion for

Summary Judgment on Count I of the Amended Complaint is **GRANTED**.

<u>b.  County Liability Under *Monell*</u>

Defendants claim that the FCCS Board is entitled to summary judgment on all claims

because Plaintiffs failed to present evidence establishing that the FCCS Board had a policy or

custom permitting racial and religious discrimination or retaliation.  Section 1983 does not allow

a plaintiff to sue a local governmental entity, such as the FCCS Board, under a *respondeat

superior* theory for the constitutional torts of its employees or agents.  *Monell v. Dep't of Soc.

Servs.*, 436 U.S. 658, 694 (1978).  Rather, a governmental entity may be held liable under § 1983

_____

[9] According to a March 2, 2009 Gallup Poll, Muslim Americans "are the most racially diverse
religious group surveyed in the United States," with African Americans making just 35% of the
population.   http://www.gallup.com/poll/116260/Muslim-Americans-Exemplify-Diversity-
Potential.aspx

only when the plaintiff can demonstrate that it engaged in a "policy or custom" that was the "moving force" behind the deprivation of the plaintiffs' rights. *Id*. The existence of an illegal policy or custom may be established in several ways, including by a showing that the entity had "a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). That method of establishing the existence of an illegal policy or custom is known as the "inaction theory." *Id*.

Plaintiffs do not contend that the FCCS Board had an official policy permitting discrimination on a racial or religious basis or retaliation against parents for complaints of discrimination. Instead, they argue that the FCCS Board can be held liable under the "inaction theory." They claim the FCCS Board was aware of its employees' unconstitutional treatment of the Plaintiffs (through Hadiya's complaints, media reports, and complaints of others—presumably Upshaw-Haider) and ratified that treatment by failing to take any action to rectify it. (Pls.' S.J. Opp'n. Br. 47.) Specifically, Plaintiffs point to the fact that the FCCS Board did not discipline or investigate its caseworkers after the juvenile court overruled the magistrate's finding of educational neglect as evidence of a policy. (*Id*.)

To succeed on an inaction theory, however, Plaintiffs must show: (1) there was a clear and persistent pattern of illegal activity; (2) the FCCS Board had notice of it; (3) the FCCS Board tacitly approved the unconstitutional policy such that its deliberate indifference amounts to an official policy of inaction; and (4) the custom or policy of inaction was the moving force driving the constitutional deprivation. *Doe v. Claiborne Cty.*, 103 F.3d 495, 508 (6th Cir. 1996). Plaintiffs bear a "heavy burden in proving municipal liability" and "cannot rely solely on a single instance to infer a policy of deliberate indifference." *Thomas*, 398 F.3d at 433 (holding that

evidence that police officers had used excessive force in the particular case before the court was insufficient to establish a pattern of illegal activity as required for municipal liability under inaction theory); *see also Doe*, 103 F.3d at 509 (6th Cir. 1996). In other words, to establish a pattern of illegal activity the plaintiff must go beyond the facts of her own case and show other instances of the alleged rights violation have occurred in other cases. *See, e.g.*, *Thomas*, 398 F.3d at 434 (noting that without such a requirement the municipal liability standard is impermissibly collapsed into a *respondeat superior* standard); *Miller v. Calhoun Cty.*, 408 F.3d 803, 815-16 (6th Cir. 2005).

Plaintiffs allegations against the FCCS Board fail under the first prong of the *Doe* test. Plaintiffs merely infer that a policy of inaction exists based on the FCCS Board's alleged failure to investigate in their case, but have failed to produce any evidence of a pattern of similar discriminatory or retaliatory activity in other cases. For that reason, Plaintiffs reliance on *Unroe v. Bd. of Educ. Rock Hill Local Sch. Dist.*, No 1:04-CV-00181, 2006 WL 22081, at *14 (S.D. Ohio Jan. 4, 2006), is misplaced. In *Unroe* the court denied summary judgment on the plaintiff's municipal liability claim against a school board. *Id.* In so ruling, however, the court relied on record evidence demonstrating a pattern of similar activity, i.e., the affidavit testimony of two parents who had complained to the school board about similar mistreatment at the hands of the school superintendent. *Id.* Conversely, in this case, the Plaintiffs have not produced any evidence that any other families complained about or experienced the type of unconstitutional treatment of which they complain.

Plaintiffs also argue that *Gregory v. City of Louisville*, 444 F.3d 725, 755 (6th Cir. 2006) counsels in favor of finding municipal liability. (Pls.' S.J. Opp'n Br. 46). *Gregory* stands for the

proposition that a municipal entity's custom or policy can be unconstitutional if it is "facially constitutional but consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers." *Id*. at 752. A facially neutral policy, however, is only actionable where the plaintiff can demonstrate that the municipal action was taken with "deliberate indifference." *Id*. Furthermore, a plaintiff must first establish that a custom or policy *existed*. Again, the only "policy or custom" identified by the Plaintiffs is the failure of the FCCS Board to take action to discipline caseworkers or conduct an in-depth investigation based on Hadiya's complaints that FCCS caseworkers were acting in a religiously and racially discriminatory manner. It is clear from the record that Hadiya's complaints were investigated by the FCCS Ombusdsman's office. Plaintiffs obviously consider that investigation insufficient. In the absence of any evidence that Spires or other caseworkers had ever been accused of similar discriminatory acts, however, the Court cannot find that the FCCS Board's failure to conduct an additional independent investigation is sufficient to prove that the FCCS Board had a policy of deliberate indifference to claims of racial or religious discrimination. *See Doe*, 103 F.3d at 508 (holding that a school board's failure to conduct additional investigation into allegations of sexual abuse against a teacher was insufficient to establish a policy of deliberate indifference to the sexual abuse of its students, even though the school board had some information that the teacher may have previously sexually abused other students.) Consequently, Plaintiffs have not met their burden of demonstrating that there is a genuine issue of material fact regarding whether an illegal FCCS Board policy exists. Therefore, the Court **GRANTS** summary judgment in favor of Defendant FCCS Board on Plaintiffs' §1983 claims (Counts 1-3).

<u>c. Supervisory Liability</u>

Defendants also argue that supervisory Defendants Allensworth and Saros are entitled to summary judgment on all claims against them because Plaintiffs have failed to demonstrate that they were actively involved in the incidents underlying Plaintiffs' claims. (Defs.' Br. 10.) Plaintiffs do not clearly respond to that argument in their brief and that failure alone warrants summary judgment in Defendants favor on that issue. *See, e.g., Dage v. Time Warner Cable*, 395 F.Supp.2d 668, 679 (S.D. Ohio 2005) (plaintiff abandoned claim by failing to address it in his responsive pleading). Plaintiffs do list actions allegedly taken by Saros and Allensworth in the fact section of their brief. Even if the Court considers this evidence, however, Plaintiffs have not adequately supported their claims against Allensworth and Saros.

A supervisor cannot be held liable under § 1983 were the plaintiff's allegations are based on a mere failure to act. *Gregory*, 444 F.3d at 751. To be liable "the supervisors must have actively engaged in unconstitutional behavior." *Id*. A supervisor's mere failure to supervise is insufficient, the plaintiff must "show that the supervisors somehow encouraged or condoned the actions of their inferiors." *Id*. at 751-52.

Defendant Allensworth was the direct supervisor of Defendant Spires. Defendant Saros was the Executive Director of FCCS. With respect to the substantive due process violations alleged in Count Two of the Amended Complaint, Plaintiffs have presented some evidence that Spires reported false information in her interview notes and argue that she did so due to a religious bias. Nevertheless, they have not presented any evidence suggesting that Allensworth knew that the information was false or condoned Spires' creation of false information. Also, while Plaintiffs have presented evidence that Spires knew that a licensed Muslim foster home was

available and chose not to place the girls in that home, there is no evidence that Allensworth was aware of that fact or encouraged such behavior. In fact, Allensworth testified that once Spires was assigned to the case, Spires became the only source of information about the family. Similarly, although Plaintiffs have shown that Saros was aware of their FCCS preceding generally, they have not presented any evidence that Saros was actively engaged in any of the allegedly unconstitutional behavior underlying Count Two of the Complaint. In short, with respect to Count Two, Plaintiffs have merely presented evidence that Allensworth and Saros failed to review Spires work to the extent Plaintiffs believe was warranted given Hadiya's complaints. That is insufficient to establish Allensworth and Saros' supervisory liability on Count 2 of the Amended Complaint and summary judgment in favor of those Defendants is **GRANTED** on that count. *See id*. at 751-52.

Turning to Plaintiffs First Amendment retaliation claim, Count Three, Plaintiffs have asserted specific acts taken by Allensworth and Saros, which apparently form the basis of the claim. They argue in their recitation of the facts that Allensworth attempted to "torpedo" Hadiya's attempt to obtain an apartment the Homeless Family Foundation by informing a representative of the Foundation that Hadiya had made death threats against Spires. They also claim that Saros retaliated against Hadiya by making statements in two Columbus dispatch articles that implied that the girls did not want to practice Islam. While Plaintiffs have presented evidence that Allensworth and Saros made the challenged statements, they have failed to present evidence from which a reasonable juror could find that Allensworth and Saros violated their First Amendment rights.

To establish a First Amendment retaliation claim, a plaintiff must show that: (1) she engaged in constitutionally protected activity; (2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was taken, at least in part, because of plaintiff's exercise of the protected conduct. *Jenkins v. Rock Hill Local Sch. Dist.*, 513 F.3d 580, 586 (6th Cir. 2008); *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). If the plaintiff can establish all three elements, the burden of production shifts to the defendant; however, the defendant will still be entitled to summary judgment if he can show that he would have taken the same action in the absence of the protected activity. *Thaddeus-X*, 175 F.3d at 399. According to Hadiya, Allensworth and Saros retaliated against her for complaining to the FCCS Ombusdsman's office and the media about how FCCS was handling her family's case. "[T]he right to criticize public officials is clearly protected by the First Amendment." *Jenkins*, 513 F.3d at 588. In this case, however, Plaintiffs have not pointed to any evidence indicating that Allensworth's and Saros' statements were motivated by Hadiya's exercise of her constitutional right to criticize FCCS employees.[10] Although Plaintiffs claim that Spires fabricated the interview notes reporting that the girls did not want to practice Islam and invented the death threat she claims Hadiya made against her, they have produced no evidence suggesting that Allensworth or Saros knew those claims were false. Moreover, the evidence

_____

[10] Instead, they merely rely on language from *Bloch v. Ribar*, 156 F.3d 673, 683 (6th Cir. 1998), stating that "claims involving proof of a [defendant's] intent seldom lend themselves to summary disposition." *Bloch*, however, addressed the dismissal of a plaintiff's retaliation claims at the motion to dismiss stage, where all factual allegations are taken as true, and a plaintiff need not produce evidence supporting her claim. While the Court recognizes that evidence of improper intent will seldom be direct, a plaintiff is not excused from providing any evidence in support of the intent element when responding to a properly supported summary judgment motion. *See Jenkins*, 513 F.3d at 589 (affirming dismissal of retaliation claim at the summary judgment stage because there was no evidence of retaliatory motivation).

establishes that Allensworth reported the death threat to the Homeless Families Foundation because it was "a safety concern that was valid to our agency." (Allensworth Dep. 287.) Nor have Plaintiffs argued that temporal proximity alone is sufficient to establish retaliatory motivation in this case. As Plaintiffs have produced no evidence in support of a necessary element of their retaliation claim against Allensworth and Saros, the Court **GRANTS** summary judgment in favor of those Defendants on Count Three of the Complaint.

### d. Absolute Immunity

Defendants claim that they are entitled to absolute immunity on Counts Two and Three of Plaintiffs' Amended Complaint. As the Court has already determined that Defendants Allensworth, Saros, and the FCCS Board are entitled to summary judgment on Counts 1-3, it will only address Defendants' absolute immunity argument as it relates to Defendant Spires.[11] Defendants argue that Counts Two and Three are predicated on Spires filing of the underlying action in the juvenile court and the juvenile court's grant of temporary custody of Makeba, Meserete, and Masika to FCCS and are, therefore, prosecutorial acts subject to absolute immunity. Plaintiffs argue that the evidence on which they rely in support of those claims is not based on Spires prosecutorial actions but, instead, on Spires pre-complaint investigatory acts and post-complaint acts that were non-prosecutorial.

---

[11] The Court notes however, that to the extent that any of Plaintiffs' claims against Allensworth and Saros are based on those Defendant's involvement in the filing of complaints against Hadiya and Naim in juvenile court, they are entitled to absolute immunity. *Kurzawa v. Mueller*, 732 F.2d 1456, 1458 (6th Cir. 1984) (holding social worker was entitled to absolute immunity when prosecuting child delinquency petition); *Imbler v. Pachtman*, 424 U.S. 409, 416, 430-31 (1976) (holding prosecutor absolutely immune from suit under § 1983 despite allegations that he knowingly presented false testimony and evidence at trial).

A defendant is only entitled to absolute immunity for activities that are an "integral part of the judicial process." *Spurlock v. Thompson*, 330 F.3d 791, 797 (6th Cir. 2003) (internal quotation marks omitted). In deciding whether a defendant is entitled to absolute immunity this Court must employ a "functional analysis" that focuses on the nature of the act performed rather than the identity of the actor who performed it, i.e., it only extends to acts that are prosecutorial or judicial in nature. *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993); *Holloway v. Brush*, 220 F.3d 767, 774 (6th Cir. 2000) (en banc). "The analytical key to prosecutorial immunity . . . is whether the actions in question are those of an advocate." *Holloway*, 220 F.3d at 775. The official seeking absolute immunity bears the burden of demonstrating that immunity is justified based on the function in question. *Burns v. Reed*, 500 U.S. 478, 486 (1991).

Social workers involved in child abuse and neglect cases are entitled to absolute immunity when they are acting in their role as legal advocates—that is initiating court actions or testifying under oath—not when they are performing administrative, investigatory, or other functions. *Holloway*, 220 F.3d at 775; *compare Saylor v. Patrick*, 874 F.2d 374, 377-78 (6th Cir. 1989) (holding social worker entitled to absolute immunity when filing child abuse petitions); *Kurzawa v. Mueller*, 732 F.2d 1456, 1458 (6th Cir. 1984) (holding social worker was entitled to absolute immunity when prosecuting child delinquency petition); *with Achterhof v. Selvaggio*, 886 F.2d 826, 830 (6th Cir. 1989) (holding social workers were not entitled to absolute immunity when investigating abuse allegations). To ascertain whether Spires is entitled to absolute immunity, the Court must examine the acts that form the basis of Plaintiffs' substantive due process and First Amendment retaliation claims against her.

The Plaintiffs allege that Spires violated their right to familial association, by fabricating evidence of physical abuse and falsely claiming that the girls did not want to practice Islam in the FCCS administrative file.  Specifically, Spires investigatory notes state that the Makeba, Masika, and Meserete corroborated their brother's complaints regarding physical abuse and that the girls repeatedly indicated that they did not want to wear the hijab or practice Islam.  In their deposition testimony, the girls testified that they never corroborated Mandela's accusations of abuse to Spires and that they did not tell her that they did not want to practice Islam.  "[N]on-testimonial, pretrial acts," including falsifying evidence, "do not benefit from absolute immunity, despite any connection these acts might have to later testimony." *Gregory*, 444 F.3d at 739, 741-42 (forensic expert and police officers not entitled to absolute immunity for their falsification of, respectively, an expert report and investigatory notes, even though they testified consistently with those documents at trial).  When viewed in the light most favorable to Plaintiffs, the evidence supports their allegation that Spires' investigative notes are false in several respects.  Spires is not entitled to absolute immunity for this pre-complaint investigatory act.  *Achterhof*, 886 F.2d at 830.

Plaintiffs also allege that Spires and the other Defendants violated their Due Process and First Amendment rights by refusing to re-unite the family after the juvenile court had granted temporary custody of the girls to FCCS and by the agency's "continuing refusal to reverse its course, and recommend that the case be dismissed."  (Pls.' Opp'n Br. 44.)  Both of those actions, however, are entitled to absolute immunity.  FCCS' retention of custody over the girls, in compliance with the juvenile court's order awarding temporary custody to the FCCS is intimately related to the judicial phase of the child custody proceeding and, thus, entitled to absolute immunity.  *See Rippy v. Hattaway*, 270 F.3d 416, 422-23 (6th Cir. 2001) (social worker's role in

advising juvenile court regarding whether to return a neglected child to the home entitled to absolute immunity). Similarly, the FCCS and its employees' role in deciding to dismiss a complaint is that of an advocate and is entitled to immunity. Therefore, Spires, as well as her co-Defendants, are immune from liability for their roles, if any, in failing to effect the girls' return to Hadiya's custody, after the magistrate judge ordered their removal and for their refusal to dismiss the complaint against Hadiya.[12]

Next Plaintiffs argue that Spires' attempts to impede the girls from practicing Islam while in FCCS' temporary custody were administrative acts that are not entitled to absolute immunity. Plaintiffs allege that Spires refused to place the girls in a Muslim foster home even though one was available. When viewed in the light most favorable to Plaintiffs, the record shows that the Makeba and Meserete were placed in a Christian foster home and taken to Christian services, were not permitted to pray together at a supervised visit, that Spires did not give the girls a contact list of religious community contacts provided by Hadiya, that Upshaw-Haider, a Muslim, was willing to take the girls into her care, that she was liscensed to act as a foster parent as of August 1, 2003, that Spires was aware of those facts, and that Spires told Upshaw-Haider that FCCS did not want the girls in a Muslim foster home. Under Ohio law, the caseworker is charged with day-to-day responsibility for the management of the case plan of a child who is in temporary custody. Ohio Rev. Code §§ 2151.412(A)(2), 2151.416(B)(1); *Holloway*, 270 F.3d at 775-76. The out-of-court acts that form the basis of Plaintiffs' free exercise claim were administrative acts undertaken in accordance with Spires' statutory duty. While managing the girls' placement on a

---

[12] Plaintiffs have also suggested that Spires, Allensworth, and Saros retaliated against Hadiya by filing the second complaint with the juvenile court. The act of filing a complaint with the juvenile court, however, is entitled to absolute immunity. *Saylor*, 874 F.2d at 377-78.

day-to-day basis, Spires was not acting as a legal advocate; therefore, those acts are not entitled to absolute immunity.

Similarly, Plaintiffs First Amendment retaliation claim against Spires is based on out-of-court acts, which are not entitled to absolute immunity. Plaintiffs allege that Spires retaliated against Hadiya by falsely reporting in the FCCS file that she assaulted Spires during the August 1, 2003 supervised visit and that she later made a death threat against Spires. Neither of those out-of-court acts are entitled to absolute immunity because they do not involve Spires' role as a legal advocate.

<u>e. Qualified Immunity</u>

Defendants claim that they are entitled to qualified immunity on all of Plaintiffs' federal claims. The Court has already determined that summary judgment is warranted on all of Plaintiffs' federal claims against all Defendants except for the substantive due process and First Amendment retaliation claims against Defendant Spires. Therefore, the Court will only discuss the parties' qualified immunity arguments as they relate to Defendant Spires' liability on Counts Two and Three.

"Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982). In this Circuit, a plaintiff must make a three-step showing to avoid summary judgment on qualified immunity grounds. *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). Plaintiff must show that: (1) based on the applicable law and the facts viewed in the light most favorable to the plaintiffs, a constitutional violation has occurred; (2) the violation involved

a "clearly established constitutional right of which a reasonable person would have known;" and (3) the government official's action was objectively unreasonable in light of the "clearly established constitutional right." *Id.*

In this case, Plaintiffs allege the violation of several known constitutional rights. First, Plaintiffs argue that Spires' fabrication of evidence in the FCCS administrative file during an abuse and neglect investigation violated their First and Fourteenth Amendment rights to familial association. Parents have a Fourteenth Amendment liberty interest in making decisions regarding the custody and control of their children and all family members enjoy a First Amendment right to familial association. *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000) (recognizing Fourteenth Amendment right); *Moore v. City of East Cleveland*, 431 U.S. 494 (1977) (recognizing First Amendment right to familial association). The right to familial association is not absolute and must be balanced by "an equally compelling governmental interest in the protection of children." *Kottmyer v. Maas*, 436 F.3d 684, 690 (6th Cir. 2006). Therefore, governmental investigation into allegations of child abuse normally do not violated a the right to familial association. *Id.* The result is different, however, where "there is evidence that the investigation was undertaken in bad faith or with a malicious motive or if tactics used to investigate would 'shock the conscience.'" *Id.* at 691 n.1. Plaintiffs have produced evidence that, when viewed in the light most favorable to them, shows that Spires fabricated evidence against them during a child abuse and neglect investigation. A reasonable case worker would have known that she was putting the familial rights of Hadiya and her children at risk when she invented evidence against a mother during an abuse investigation. *See id.* This is especially true given that the fabrications were recorded in the official administrative file, which would foreseeably form the basis of a complaint against

Hadiya.  Moreover, Spires would have been aware that as the caseworker she was the sole source of information about the family.  (Allensworth Dep. 77-78.)  As a result, Spires is not entitled to qualified immunity with respect to Plaintiffs' familial association claim.

Second, Plaintiffs argue that Spires violated the girls' right to free exercise of religion while they were in FCCS custody.  Defendants do not dispute that the Plaintiffs possess a First Amendment right to free exercise; however, they claim that Plaintiffs have failed to establish that Spires violated that right given that Makeba, Masika, and Meserete all testified that Spires never pressured them to renounce their religion.  Most rights are "clearly established" at some level of generality; therefore, "immunity would be impossible to obtain if a plaintiff were required only to cite an abstract legal principle that an official had 'clearly' violated." *Martin v. Heideman*, 106 F.3d 1308, 1312 (6th Cir. 1997).  Therefore, whether a right is "clearly established" must be "undertaken in light of the specific context of the case, not as a broad general proposition." *Floyd v. City of Detroit*, 518 F.3d 398, 405 (6th Cir. 2008).  In response to Defendants' qualified immunity argument, Plaintiffs fail to cite a single precedent establishing that, even when viewed in the light most favorable to the Plaintiffs, Defendants acts—placement in a Christian foster home, refusal to place them in a Muslim foster home, refusal to provide them with a list of Muslim leader's phone numbers, or falsely reporting in FCCS' administrative file that they did not want to practice Islam—interfered with their right to free exercise.  Accordingly, they have waived their free exercise claim by failing to support or develop it.  *Robinson*, 390 F.3d at 886 (undeveloped arguments are waived); *Lanzotti*, 205 F.3d at 957.  As Plaintiffs have failed to

establish that a violation of their free exercise rights occurred, Spires is entitled to qualified immunity, and summary judgment on that claim.[13]

Third, Plaintiffs allege that Spires violated Hadiya's free speech rights by retaliating against her for complaining against FCCS' conduct during the abuse investigation. As previously discussed, to demonstrate that she was retaliated against for exercising her First Amendment rights, Hadiya must show that: (1) she engaged in constitutionally protected activity; (2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was taken, at least in part, because of her exercise of the protected conduct. *Jenkins*, 513 F.3d at 586. It is undisputed that Hadiya engaged in constitutionally protected activity by criticizing the actions of the FCCS' staff to the FCCS Ombudsman Office, the media, and others. Hadiya claims that Spires took two adverse actions against her in response to her complaints. First, she claims that Spires invented a story that Mandela called her at home and reported that he had been recruited by his mother to kill Spires. Spires testified at her deposition that the death threat occurred and both she and Allensworth testified that Spires filed out an incident report regarding the threat. Although they conclusorily state that the death threat was a fabrication, Plaintiffs have failed to produce any evidence that the threat was made up, including failing to cite to testimony from Hadiya's deposition or to produce an affidavit by Hadiya or Mandela on the issue. As Plaintiffs have not produced any evidence in support of their claim that the death threat was a retaliatory fabrication, they cannot premise a First Amendment retaliation claim on the basis of the death threat.

---

[13] Plaintiffs also allege that Defendants violated their right to be free from racial discrimination "because of the inextricable intertwining in this case of religion and race." (Pls.' Opp'n Br. 39.) The Court has already rejected that argument and finds again here that, for the reasons set forth in Section IV.A.1.a. *supra*, plaintiffs have failed to produce any evidence that their constitutional right to be free from racial discrimination has been violated.

Next, Hadiya claims that Spires retaliated by falsely reporting that Hadiya assaulted her during an August 1, 2003 supervised visit with the girls. She has supported that allegation by the testimony of Makeba, who claimed that Spires actually grabbed Hadiya during the visit, not the other way around. (Makeba Dep. 58.) Facing the loss of one's children as a result of being accused of battering a caseworker during a child abuse investigation, based on verbally opposing FCCS' actions, would deter a person of reasonable firmness from engaging in the activity. If the jury believes Hadiya's version of events they could reasonably conclude that Spires' fabrication was motivated, at least in part as a response to her speech. The law is well-established that a public official's retaliation against an individual for exercising her First Amendment rights constitutes a § 1983 violation. *See Jenkins*, 513 F.3d at 586, 588. Moreover, a reasonable caseworker should have known that fabricating evidence against a mother to punish her from complaining about an FCCS investigation would violate her clearly established First Amendment rights. Consequently, Spires is not entitled to qualified immunity with respect to Plaintiffs' claim for retaliation for exercising her free speech rights.

### 2. *Intentional Infliciton of Emotional Distress*

Defendants argue that they are entitled to summary judgment on Plaintiffs' state law claim for intentional infliction of emotional distress because they are statutorily immune from suit. Plaintiffs concede that the FCCS Board is immune from suit under Ohio Rev. Code § 2744.02(A)(1). Hence, summary judgment in favor of the FCCS Board is **GRANTED** on this claim. Plaintiffs argue, however, that the individual Defendants are not immune because they acted with a malicious purpose, in bad faith, or in a wanton or reckless manner.

Although employees of political subdivisions are granted broad immunity from civil

liability under Ohio law, they are not immune if the plaintiff can establish that "the employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b). The law, however, creates a "presumption of immunity" which plaintiffs must overcome to establish liability. *Cook v. Cincinnati*, 658 N.E.2d 814, 821 (Ohio App. Ct. 1995). Mere negligence is insufficient to give rise to personal liability; instead, the plaintiff must show "wanton misconduct,"meaning that the defendant "failed to exercise any care whatsoever." *Fabrey v. McDonald Village Police Dept.*, 639 N.E.2d 31, 35 (Ohio 1994). A defendant's negligence only gives rise to liability if the actor is "conscious that his conduct will in all probability result in injury." *Id.*

Plaintiffs have not met this stringent burden with respect to Defendants Allensworth and Saros. The record evidence in this case supports their claim that they merely relied on the evidence presented by their subordinate and carried out their statutory duty to investigate the child abuse allegations brought to them by Mandela. The mere fact that the juvenile court ultimately determined that the magistrate had erred in finding that there had been educational neglect does not transform Allensworth's and Saros' actions into malicious, wanton, reckless, or bad faith conduct. *See Cook*, 658 N.E.2d at 91 (trial court's dismissal of disorderly conduct charges did not evidence bad faith or maliciousness on the part of the arresting officer). As Plaintiffs have failed to produce sufficient evidence to rebut the presumption of immunity accorded to Defendants Allensworth and Saros, summary judgment in favor of those Defendants on Plaintiffs' state law tort claim is **GRANTED**.

Plaintiffs have presented evidence that Defendant Spires conduct was in bad faith. Specifically, as previously discussed, they have presented evidence from which a reasonable juror

could find that Spires fabricated evidence against Hadiya in the FCCS administrative file.  The creation of false evidence against a parent during an abuse investigation is conduct that had a high probability of causing injury to Hadiya given the fact that Spires was aware that her superiors would rely on her investigatory notes in deciding whether and how to proceed with the case. Therefore, the Court finds that Plaintiffs have created a genuine issue of material fact regarding Spires entitlement to immunity on the intentional infliction of emotional distress claim. Defendants have made no other arguments in support of summary judgment on that claim. Accordingly, Defendants' motion for summary judgment in favor of Spires on Plaintiffs' state law claim is **DENIED**.

### B.  Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs claim they are entitled to partial summary judgment against Defendants on the issue of whether Defendants are collaterally estopped from arguing that the removal of the girls from Hadiya's home was reasonable.  Specifically, they argue that the reasonableness of the FCCS' efforts to keep the family together was litigated before the juvenile court in the underlying neglect case and that the juvenile court ruled on the issue in Plaintiffs' favor in its September 1, 2005 Order terminating the neglect case against Hadiya and Naim.  The Court has granted summary judgment in favor of Defendants FCCS Board, Allensworth, and Saros on all Counts. Thus, Plaintiffs' collateral estoppel claim will be analyzed only in relation to Plaintiffs' surviving claims against Spires.

Collateral estoppel (a.k.a. issue preclusion) "prevents parties or their privies from relitigating facts and issues in a subsequent suit that were fully litigated in a prior suit." *Thompson v. Wing*, 637 N.E.2d 917, 923 (Ohio 1994). When determining whether Spires is

precluded by the Ohio juvenile court order from re-litigation of the reasonableness of FCCS' attempts to keep the Abdulsalaam family together, this Court applies Ohio law.  *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984) ("It is now settled that a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.").  In Ohio, the party asserting collateral estoppel has the burden of establishing that the fact or issue "(1) was actually and directly litigated in the prior action, (2) was passed upon and determined by a court of competent jurisdiction, and (3) when the party against whom collateral estoppel is asserted was a party in privity with a party to the prior action."  *Thompson*, 637 N.E.2d at 923; *Goodson v. McDonough Power Equip., Inc.*, 443 N.E.2d 978, 985 (Ohio 1983).

It is undisputed that Spires was not a party to the juvenile court action.  Instead, Plaintiffs argue that Spires can be bound by the juvenile court's ruling because she was in privity with FCCS, who was a party.  The concept of privity for purposes of res judicata is "somewhat amorphous." *Brown v. Dayton*, 730 N.E.2d 958, 962 (Ohio 2000).  "As a general matter, privity 'is merely a word used to say that the relationship between one who is a party on the record and another is close enough to include that other within res judicata.'"  *Thompson*, 637 N.E.2d at 923 (quoting *Bruszewski v. United States,* 181 F.2d 419, 423 (2d Cir. 1950).)  Accordingly, privity may be established by "an interest in the result of and active participation in the original lawsuit." *O'Nesti v. DeBartolo Rlty. Corp.*, 862 N.E.2d 803, 806 (Ohio 2007).  Nevertheless, "[t]he essential test in determining whether the doctrine of collateral estoppel is to be applied is whether the party against whom the judgment is being asserted had full representation and a 'full and fair opportunity to litigate that issue in the first action.'"  *Cashelmara Villas Ltd. P'ship v.*

*DiBenedetto*, 623 N.E.2d 213, 215 (Ohio 1993) (quoting *Goodson v. McDonough Power Equip., Inc.*, 443 N.E.2d 978, 985 (Ohio 1983)); *see also  Allen v. McCurry*, 449 U.S. 90, 104 (1980).  In this case, Plaintiffs have not shown that Spires had representation or a fair opportunity to litigate the reasonableness of her efforts to keep the Abdulsalaam family together before the juvenile court.  They have also failed to demonstrate that Spires was an "active participant" in the juvenile case such that she should be considered to be in privity to FCCS.

An analogous situation was addressed in *Sperry v. Born*, No. 87-CV-40234-FL, 1987 U.S. Dist. LEXIS 15384, at *11 (E. D. Mich. Dec. 18, 1987).  In *Sperry*, a § 1983 plaintiff attempted to preclude police officer defendants from relitigating the constitutionality of his search and arrest.  *Id*.  The plaintiff had been prosecuted by the state earlier for carrying a concealed weapon, but the charges against him were dropped after the state court held the search and arrest unconstitutional and suppressed the gun.  *Id*.  Although the constitutionality of the search had been decided by the state court, the *Sperry* court held that the officers could not be collaterally estopped by the state decision because they did not have a full and fair opportunity to litigate the issue below.  *Id*. at *10-11.  The court reasoned that, with respect to the underlying state prosecution, the officers were merely witnesses and could not be considered the same party as the State merely because they were law enforcement officers and the State was a party to the prosecution.  *Id*. at *9-10. The court explained:

> [w]hile there is a simplistic attraction to plaintiff's argument, nevertheless it must be rejected. The rejection is mandated by the new test or requirement since neither defendant had a full and fair opportunity to litigate the issue in the state proceedings. There is simply no way that it can be said that these individual police officers, merely because they were possible witnesses, could litigate the issue. They were not represented by their own attorney, there is no showing that the prosecutor had the same interest as they did, and, as a matter of fact, the Court acknowledges that the interest of a prosecutor and that of law enforcement officers is clearly not identical

and may at times even be antagonistic. There is no showing that the officers played any role in any decision as to the criminal case or even that they were capable on their own, without legal advice, to make appropriate decisions in regard to the state court issue.

*Id.* The same considerations counsel against the application of collateral estoppel in this case. As an FCCS caseworker, Spires was not represented by counsel during the juvenile proceeding and Plaintiffs have made no showing that she directed the course of the legal proceeding. Plaintiffs argue that the Court should consider Spires to be in privity with FCCS because her actions and decisions during the investigation of the abuse and neglect allegations "motivated the original removal later found to be unreasonable" and because her actions led to Hadiya's prosecution. (Pls.' Reply Br. 3.) While it is true that Spires investigatory notes were important to the course of the case and that Spires assisted in the creation of the complaint, once the complaint had been filed, Spires' role in relation to the litigation became that of a material witness. Furthermore, the Court is unconvinced by Plaintiffs' argument that Spires' interests were at all times the same as the interests of FCCS. The interests of a caseworker investigating a neglect case and the agency prosecuting the case may easily diverge, especially when, as in this case, the caseworker is accused of acting contrary to agency policy and protocol. As Plaintiffs have failed to establish an essential element of their collateral estoppel claim, their motion for partial summary judgment is **DENIED**.

## V. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment is

**GRANTED in PART and DENIED in PART** as follows:

1.  Summary Judgment is **GRANTED** in favor of Defendants FCCS Board, Allensworth, and Saros on all counts.

2.  Summary Judgment in favor of Defendant Spires on Count 1 (§1981 claim) is **GRANTED**;

3.  Summary Judgment in favor of Defendant Spires on Count 2, is **GRANTED** to the extent that Plaintiffs are asserting a violation of their right to free exercise of religion; but **DENIED** on Plaintiffs' familial association claim.

4.  Summary Judgment in favor of Defendant Spires on Count 3 (First Amendment Retaliation) and Count 4 (Intentional Infliction of Emotional Distress) is **DENIED**.

Plaintiffs' Motion for Partial Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**



     **s/Algenon L. Marbley**
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**


**DATED:** July 23, 2009